UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re                                                    Chapter 12
Gary Przybylski and
Diane Przybylski,                                        Case No. 04-36073-svk
      Debtors.

**Memorandum Decision on Objection to Exemptions
and Objection to Confirmation of the Plan**

      This case explores the often fuzzy line between permissible pre-bankruptcy planning and the disposition of assets with the intent to hinder, delay or defraud creditors. The Debtors filed a chapter 7 bankruptcy petition on November 10, 2004. The chapter 7 Trustee and two creditors – Nutrition Service Company, Inc. ("NSC") and Russell Robaidek – objected to the Debtors' exemptions. Prior to the hearing, the Trustee worked out a settlement with the Debtors, but NSC and Robaidek pursued their Objections. At the conclusion of the hearing, the Trustee summarized his proposed settlement with the Debtors (which was contingent upon receipt of certain information and documents), and the court ruled that notice of the settlement should be given to all the creditors, with the understanding that NSC and Robaidek could object if they did not approve of the settlement.

      The Debtors were required to provide various documents to the Trustee and the creditors, and to allow appraisal of assets that NSC claimed were undervalued. After the information and documents were provided, rather than seeking approval of the settlement, the Trustee filed a Complaint objecting to the Debtors' discharge. Trial on that adversary proceeding was scheduled for November 18, 2005, and on October 3, 2005, the Debtors moved to convert their case to a chapter 12 case. The Motion to Convert to chapter 12 was contested by NSC and Robaidek, but was ultimately approved by the Court.

      The Debtors filed a chapter 12 plan proposing to pay all of their secured creditors outside the plan. For the unsecured creditors, the plan calls for payments of $751 per month for 36 months plus $29,500 to be withdrawn from the Debtors' retirement accounts in the 36th month. After trustee commissions, depending upon the final amount of the claims, these payments result in an approximate 12% dividend for unsecured creditors.

      NSC filed an Objection to the Debtors' exemptions and an Objection to Confirmation of the Plan. The basis for the Objection to Confirmation is the Debtors' alleged lack of good faith in the proposal of the plan and the failure of the "best interest of creditors" test of § 1225(a)(4) of the Bankruptcy Code. According to NSC, the plan fails the best interest test because the exempt property is undervalued by the Debtors and some of the exemptions should be disallowed because they were created on the eve of bankruptcy with the intent to hinder, delay or defraud creditors. NSC also argues that the plan was not proposed in good faith due to the Debtors' aggressive pre-bankruptcy planning.

The Debtors' financial problems started when they expanded their dairy operation in the year 2000. Faulty installation of the milking parlor led to herd health issues, and low milk prices compounded the problem. A refinancing came up short in 2003, and the Debtors decided in November 2003 to sell their farm. On April 30, 2004, the Debtors sold the farm. Approximately $281,000 was left from the sale after paying secured and tax creditors, and the Debtors used this money to purchase a new residence and to pay current bills. They purchased some beef cattle and a few dairy cows, and Mr. Przybylski now engages in custom farming. Mrs. Przybylski has a good job off the farm. With the help of an attorney, they attempted to negotiate an out of court settlement with the unsecured creditors from the old farming operation. When that effort failed, the Debtors engaged in some pre-bankruptcy planning and filed the chapter 7 petition in November 2004. NSC is by far the largest unsecured creditor, owed over $230,000. NSC supplied feed and nutrition services to the dairy operation. NSC testified that numerous promises were made and broken by the Debtors in response to NSC's pleas for payment. NSC was in the process of obtaining a state court judgment when the Debtors' petition was filed.

The Debtors' plan admits that they have $21,854 in non-exempt property, including $11,801 in non-exempt farm machinery. The Debtors claim that their residence is fully exempt. NSC claims that the Debtors have undervalued their residence and six items of farm equipment, and that when the correct values are used, the proposed plan fails the best interest test, because a chapter 7 trustee would be able to liquidate these assets for more than the Debtors are proposing to pay under the plan.

The first issue for decision is the proper date to conduct the liquidation analysis. The parties have assumed that the petition date controls, but § 1225(a)(4) requires that "as of the effective date of the plan" creditors must receive no less on their claims than they would receive if the debtor's bankruptcy estate were liquidated under chapter 7 "on such date."[1] The timing in a routine chapter 12 case may not result in a material difference in asset values between the petition and confirmation, because § 1221 requires the plan to be filed within 90 days of the

---

[1] Although there are cases to the contrary, arguably the effective date of the plan should be the date of confirmation, not the date that the original chapter 7 petition was filed. *See Hollytex Carpet Mills v. Tedford*, 691 F.2d 392 (8th Cir. 1982). In *Robb v. Lybrook (In re Lybrook),* 107 B.R. 611, 613 (Bankr. N.D. Ind. 1989), the court stated: "This hypothetical liquidation analysis is based upon the bankruptcy estate as it exists at the time of confirmation and not upon its composition when the petition was originally filed. *See In re Barnett*, 95 B.R. 477 (Bankr. W. D. Ky. 1988); *Matter of Bluridg Farms, Inc.*, 93 B.R. 648, 651-654 (Bankr. S.D. Iowa 1988)(both cases discussing the identical Chapter 12 counterpart to § 1325(a)(4))." Although *Lybrook* and similar cases concerning the property of the chapter 7 estate after conversion from chapter 13 have been superceded by the 1994 amendments to Bankruptcy Code § 348(f), the valuation of property of a chapter 12 estate for purposes of the "best interest" test was not altered by the amendments.

petition and § 1224 states that the confirmation shall be held on expedited notice. But in this case, the petition was filed in November 2004, conversion to chapter 12 occurred roughly a year later, and the contested confirmation hearing was held on March 15, 2006. However, since the only valuation evidence presented by the parties uses the November 2004 petition date, that is the date that will be used for the analysis.

The Debtors purchased their residence on May 17, 2004 for $249,000. They produced an appraisal for $255,000, and NSC offered an appraisal of $283,000 from a local appraiser. The parties stipulated to the admission of the appraisals, and there was no opportunity to cross-examine the appraisers. The Debtors argued that the comparable sales used by NSC's appraiser were closer to the highway to Green Bay, but NSC countered that the Debtors purchased the property from a relative of one of the Debtors, possibly reducing the sale price. Mrs. Przybylski testified that the relative is a fourth cousin of Mr. Przybylski, and the property was for sale for over three years. The court concludes that the value of the residence for purpose of the best interest of creditors test is $255,000. The actual purchase price of the property in an arms-length transaction is compelling evidence of its value, and while some appreciation would be expected, the property would not have appreciated to the extent claimed by NSC in the 6 months between the purchase and the petition. The fact that one of the sellers was a distant relative of Mr. Przybylski does not alter the conclusion. The liens on the residence total $207,000,[2] and the Debtors could claim the full $40,000 exemption, leaving $8,000 in non-exempt equity.

The valuation testimony on the farm equipment was also conflicting. NSC offered the testimony of Daniel Pate, a salesman at a local John Deere dealer. Mr. Pate has about 4 years experience in sales and marketing of John Deere equipment. He viewed the Debtors' equipment and testified that the equipment has a "trade-in" value of $7,500 for the John Deere Skid Steer Loader; $19,500 for the John Deere 4440 Tractor; $7,500 for the John Deere 1750 6-row planter; $500 for the John Deere 874 Manure Spreader; $4,500 for the John Deere 455 Garden Tractor; and $1,200 for a Chaparral Stock Trailer. The Debtors agreed with the valuation on the Manure Spreader, but most of the Debtors' other valuations were significantly lower. For example, the Debtors value the John Deere 4440 Row Crop Tractor at $10,000, almost half of Mr. Pate's opinion. Daniel Pate's testimony was detailed and supported by experience in the equipment business. He reviewed current valuation information in a publication received by the dealership, which factors in auctions and other methods of selling used farm equipment. He was very knowledgeable as to the condition and number of hours on the equipment. Mr. Przybylski did not appear at the confirmation hearing, but Mrs. Przybylski testified that the values given by the Debtors in their amended schedules were estimates based on reading ads in the newspapers and attending auctions every couple months. Utilizing the November 2004 date of the petition as the valuation date, the court finds that the values introduced by NSC are more appropriate for the liquidation analysis. Accordingly, the total value of the farm equipment is $40,700. The Debtors owned some hay and corn silage as of the petition date, and there was a lien of $3,700 in favor of John Deere against two items of equipment. Adding the hay and corn and subtracting

---

[2] The alleged improper creation of the second mortgage will be discussed later.

the lien, the equity in the farm equipment and silage totals $37,525.00. The Debtors have claimed $15,000 exempt, resulting in a value of $22,525 in non-exempt farm equipment and inventory.

In their chapter 12 plan, the Debtors admit that they have an additional $10,053 in non-exempt assets, including the livestock and $1,000 in a timeshare interest. Assuming none of their exemptions are disallowed, and no avoidable transfers are recovered, the total non-exempt equity is $40,578.[3] Trustee commissions and liquidation expenses would reduce that value in a chapter 7 liquidation. The Debtors' plan provides for payments totaling $56,536, although $29,500 of that amount will not be paid until the 36th month, and an adjustment must be made to determine the value of the plan payments as of the effective date of the plan. In performing the best interest of creditors test, "[W]hat is to be compared is the total of the payments to the creditor, discounted to present value, and the amount the creditor would receive in a straight liquidation." *Ravenot v. Rimgale (In re Rimgale)*, 669 F.2d 426, 430 (7th Cir. 1982).[4] At a discount rate of 6%, the present value of the Debtors' plan payments, including the balloon payment, is around $45,000. Accordingly, the Debtors' plan passes the best interest of creditors test unless their exemptions are disallowed.

The Debtors' residence is subject to two mortgages: a purchase money mortgage in the amount of $195,000 and a second mortgage for $12,000. The second mortgage was obtained in August 2004 as part of the Debtors' pre-bankruptcy planning. The Debtors testified that the new residence had equity in excess of the allowed exemption, so they took out a home equity loan. They used $10,000 of the loan to fund an exempt annuity and $1,100 was deposited into a savings account that has been claimed as exempt. NSC objects to the exemption of the homestead to the extent of the $12,000 home equity loan, contending that the exemption was created with the intent to hinder, delay or defraud creditors. NSC also objects to the following exemptions created within six months of bankruptcy:

| Property | Value |
|---|---|
| Down payment on residence | $50,000 |
| Annuity (joint names) | 35,000 |
| Annuity (Gary's name) | 1,800 |
| New life insurance policy (Gary) | 4,440 |

---

[3] This is the sum of $8,000 equity in the residence, $22,525 equity in the farm equipment and $10,053 in the livestock and timeshare interest.

[4] *Rimgale* is a chapter 13 case, and this is a chapter 12. However, "The requirements for confirmation of a Chapter 12 plan set forth in 11 U.S.C.§ 1225 are substantially the same as those applicable to Chapter 13 plans (*See* 11 U.S.C. § 1325), and analogy may be made to Chapter 13 precedents in interpreting § 1225." *In re Zurface*, 95 B.R. 527, 535 (Bankr. S.D. Ohio 1989).

4

| | |
|---|---:|
| New life insurance policy (child #1) | 884 |
| New life insurance policy (child #2) | 450 |
| Savings account deposit | 1,200 |
| Total | $93,774 |

Also, NSC objects to the following transfers made on the eve of bankruptcy:

| | |
|---|---:|
| Edvest Account (child #1) | $11,000 |
| Edvest Account (child #2) | 11,000 |
| Repay life insurance policy loan | 3,280 |
| Repay 401(k) loan | 9,709 |
| Repay loan to relative | 7,500 |
| Total | $42,489 |

    The Debtors note that they were only trying to take advantage of legitimate exemptions. "Conversions of assets from non-exempt to exempt forms within the year preceding a petition for bankruptcy are not necessarily fraudulent to creditors." *Smiley v. First Nat'l Bank of Belleville (In re Smiley)*, 864 F.2d 562, 566 (7th Cir. 1989). In *Smiley*, a debtor, while engaged in negotiations with creditors, transferred assets and purchased an exempt homestead in Kansas. The Seventh Circuit held that pre-bankruptcy planning is not necessarily a fraud on creditors, but that if extrinsic signs of fraud exist, the debtor's discharge should be denied. *Id.* at 567. In *Smiley*, the court found that debtor's misrepresentation about the value of certain assets kept the creditors from filing an involuntary bankruptcy petition against him, allowing Smiley to establish residency in Kansas and claim the Kansas homestead exemption. *Id* at 568. Other examples of extrinsic signs of fraud noted by the Seventh Circuit include:

> (1) that the debtor obtained credit in order to purchase exempt property; (2) that the conversion occurred after the entry of a large judgment against the debtor; (3) that the debtor had engaged in a pattern of sharp dealing prior to bankruptcy; . . . and [(4)] that the conversion rendered the debtor insolvent.

*Id.* at 567 (citations omitted). The court of appeals specifically held that Smiley did not intend to defraud his creditors: "Since Mr. Smiley was trying to take advantage of legal exemptions, it is not clear that he intended to *defraud* his creditors." *Id.* at 568 (emphasis in original). However, Smiley's actions showed that he intended to hinder or delay the creditors, and the court affirmed the bankruptcy court's denial of Smiley's discharge. *Id.* at 569.

    While this case does not involve the denial of a discharge under Bankruptcy Code § 727, NSC has objected to the Debtors' exemptions. The test is the same, as noted by the Eighth Circuit Court of Appeals: "Although the determination as to whether a discharge should be granted or denied is governed by federal law, the standard applied consistently by the courts is the same as that used to determine whether an exemption is permissible, i.e. absent extrinsic

evidence of fraud, mere conversion of non-exempt property to exempt property is not fraudulent as to creditors even if the motivation behind the conversion is to place those assets beyond the reach of creditors." *Norwest Bank Nebraska, N.A. v. Tveten*, 848 F.2d 871, 874 (8th Cir. 1988).

At least two of the *Smiley* factors apply to some extent in this case. The Debtors used credit to purchase some of the exempt property, and a large judgment was about to be taken by NSC. However, satisfaction of these factors alone were not enough in *Smiley* for the court to deny the discharge; rather it was Mr. Smiley's misrepresentations and deception of his creditors that led to his demise. *Smiley*, 864 F.2d at 568.

Unlike in *Smiley*, there is no evidence that the Debtors told NSC that they had unencumbered property that they had actually pledged in order to purchase exempt property. Nor is there any evidence that the Debtors told NSC that an asset, like Smiley's life insurance policy, was worth far less than its actual value. Accordingly, the Debtors' conduct may pass the *Smiley* test. However, in *In re Bogue,* 240 B.R. 742 (Bankr. E.D. Wis. 1999), this court listed additional factors that signal fraudulent exemption planning. The debtor in *Bogue* purchased annuities on the eve of his chapter 7 petition and claimed them as exempt. The trustee objected both to the exemption as well as the debtor's procurement of the annuities, arguing that they had been purchased with the intent of defrauding the creditors. The court denied the trustee's objections after analyzing the factors from *Smiley* and other "extrinsic signs of fraud." *Bogue*, 240 B.R. at 750-751. A comparison of the standards set in *Bogue* to this case is as follows:

1. Amount of exemption. Close to $150,000 is involved. This is far more than the $17,800 deemed reasonable in *Bogue*.

2. Proximity of time of conversion to time of filing for bankruptcy. The conversion of the assets all occurred within 6 months of the bankruptcy petition. In *Bogue*, the annuities were purchased within days of the filing.

3. Source of funds used to acquire exempt property. The Debtors took out a $12,000 second mortgage on their house in order to reduce their equity to $40,000, the limit of Wisconsin's homestead exemption. They used $11,100 of the proceeds of the loan to create more exempt property. The balance of the proceeds were from the sale of property in an arms length transaction. In *Bogue*, the debtor sold property and used the proceeds to purchase the annuities; in fact the court stated that had the debtor not sold the property, the debtor could have claimed the bulk of the property as exempt. The court expressly stated that *Bogue* did not involve borrowed funds that were used to purchase exempt property.

4. Misleading contacts with creditors by debtors while in the process of converting the assets from non-exempt to exempt status. There was no evidence that the Debtors made the overt misrepresentations as in *Smiley*. However, they certainly continuously promised NSC that it would be paid out of various refinancings and sales, which did not occur. No misrepresentations or concealment existed in *Bogue*.

6

5. Purpose of the conversion of assets. The Debtors' purpose was to protect the assets from their creditors as well as plan for retirement. Unlike the 58-year old debtor in *Bogue*, however, the Debtors are both in their mid-40's, and Mrs. Przybylski has a high-paying job with retirement accounts of over $160,000.

6. Conveyances for less than fair consideration. As in *Bogue,* the bulk of the funds used to purchase the exempt annuities and other exempt assets originated from the sales of assets to non-insiders for fair consideration. In contrast to *Bogue*, except for possibly $40,000 of the proceeds from the farm real estate to the new residence, the funds used to purchase the exempt assets were not the proceeds of exempt property.

Application of the *Bogue* factors to this case compels the conclusion that, at least as to the $11,100 exemptions created with borrowed funds, the Debtors' exemptions should be denied.

In addition to the question of whether there is extrinsic evidence of fraud in the Debtors' exemption planning, this case concerns the confirmation of a chapter 12 plan which may only be confirmed if the plan has been proposed in good faith. 11 U.S.C. § 1225(a)(3). NSC cites *In re Zurface*, 95 B.R. 527 (Bankr. S.D. Ohio 1989) which held that debtors who had transferred assets in fraud of their creditors could not obtain confirmation of a chapter 12 plan for lack of good faith. However, *Zurface* involved far more egregious conduct than is at issue here. In *Zurface*, the debtors formed a corporation (H-D) whose sole stockholder was one of the debtor's sisters. The debtors then transferred all of their farm assets to the corporation to keep their bank (FLB) from foreclosing on their property. According to the court:

> Simply put, there were no federal, state or local tax benefits planned or obtained from forming H-D. Likewise, the claimed estate-planning benefits were nonexistent and may really result in additional liabilities. . . . In sum, H-D was created for the sole purpose of placing assets beyond the reach of FLB and with the intent of hindering, delaying and defrauding FLB and other creditors.
>
> The totality of the circumstances involved in the formation of H-D and proposal of Debtors' plans further evidences their bad faith. Debtors continued to negotiate with FLB in April 1986 and thereafter regarding their liability to FLB and possible liquidation of their Equipment and Livestock while contemporaneously divesting themselves of as much of their property as possible without calling attention to their scheme. They wisely avoided perfecting security interests in the Equipment and Livestock or of transferring real property because a review of the county's public records would have exposed their plot. After transferring most of their property to H-D, the Debtors, through H-D, "paid" themselves and other family in excess of $150,000 in cash, loans and gifts. Many of the liquid assets transferred from H-D to Debtors and other Zurface family members have been dissipated and cannot be accounted for.

*Id.* at 536-537.

7

This case bears little resemblance to the obvious fraud on creditors in *Zurface*. The Debtors' conduct here is closer to – although still not quite as extreme as – the situation in *In re Hendricks*, 250 B.R. 415 (Bankr. M. D. Fla. 2000). In *Hendricks*, after a large judgment was entered against the debtor, she moved to Florida and purchased an exempt homestead with her nonexempt assets. When the judgment creditor pursued her in Florida, she filed a chapter 7 bankruptcy. The trustee and her largest creditor filed a complaint objecting to her discharge, and the debtor responded by converting her case to chapter 13 and proposing a plan that offered nothing for unsecured creditors and a balloon payment in the 36th month. The plan was not confirmed due in part to the debtor's lack of good faith and the possibility that the balloon payment would never be paid. In this case, after the failure of the negotiations with the Debtors' largest creditor, they converted virtually all of their nonexempt assets to exempt assets, and repaid loans to insiders and creditors of their current operation. While converting the proceeds of their dairy farm operation to exempt retirement accounts is one thing, they even borrowed money against their home to keep the equity under the exemption limit. They then filed a chapter 7 case. When their discharge was challenged, they converted to chapter 12, and proposed a plan with a 12% dividend to unsecured creditors, including a balloon payment in the 36th month.

In his treatise on Chapter 13 bankruptcy, Judge Lundin states: "The transfer of assets on the eve of bankruptcy is a lightning rod for intense scrutiny of the debtor's good faith. Creditors build a convincing good-faith objection to confirmation by demonstrating that the debtor tried to put assets out of reach immediate to the filing." Keith M. Lundin, *Chapter 13 Bankruptcy*, 3d Ed. § 181.1 (2000 and Supp. 2004). Judge Lundin points out that these transfers also may cause the plan to fail the "best interest of creditors test" since a chapter 7 trustee would likely avoid them, and goes on to recommend that in order to achieve confirmation, debtors who have engaged in "suspicious" transfers either can undo the transfer or propose to compensate creditors through the plan for the value of the property. *Id.*

Here, even allowing for the conversion of the exempt equity from the farm sale into the exempt equity in the new residence, there are additional suspicious transfers that cannot be ignored. The Debtors' repayments of their obligations to their relative, 401(k) plan and life insurance company all might have been challenged by a chapter 7 trustee as preferences or fraudulent conveyances. Similarly, the creation of the Edvest accounts for the children could have been pursued as fraudulent transfers. *See Barber v. Dunbar (In re Dunbar)*, 313 B.R. 430 (Bankr. C.D. Ill. 2004). And, in the context of the rest of the case, the creation of the exempt savings account and annuity with borrowed funds from the second mortgage does not pass muster. A chapter 7 trustee might recover $94,167[5] for the Debtors' creditors. Even reducing this amount for hypothetical chapter 7 trustee commissions and liquidation expenses, the best

---

[5] This is $40,578 from the nonexempt equipment and real property, $42,489 in potentially avoidable transfers, and $11,100 in the annuity and savings account exemptions created with borrowed money with the creditors at the door – unmistakable extrinsic evidence of fraud.

interest of creditors test of §1225(a)(5), cannot be satisfied by the Debtors' proposal to pay $56,536, especially when over half of that amount is to come from a balloon payment in the 36th month.

      Although this is a closer case than *Smiley*, *Zurface* or *Hendricks*, the court concludes that the Debtors' plan cannot be confirmed as proposed. The pre-bankruptcy planning fails the test enunciated in *Bogue*, and the totality of the circumstances points to a lack of good faith in the proposal of the plan. The Debtors' plan also fails the best interest of creditors test after the potentially avoidable transfers and undervalued assets are considered. For the foregoing reasons, confirmation of the Debtors' chapter 12 plan is denied.

      A separate order will issue.

Dated: April 14, 2006

By the Court:

_Susan Kelley_
Susan V. Kelley
U.S. Bankruptcy Judge